IN THE MATTER OF THE TRUST ESTATE OF LUCY KALANIKUMAIKIEKIE HENRIQUES, DECEASED.

No. 2462.

SUBMITTED SEPTEMBER 1, 1943. DECIDED OCTOBER 12, 1943.

KEMP, C. J., PETERS AND LE BARON, JJ.

OPINION OF THE COURT BY KEMP, C. J.

Bruce Cartwright and Norman W. Applegarth were cotrustees under the will and of the estate of Lucy K. Henriques, deceased, from July 21, 1937, to March 11, 1939, when Bruce Cartwright died. On June 6, 1939, Norman W. Applegarth, the surviving trustee, pursuant to the power in him vested by the will of the decedent, filed in the equity court his appointment of William Edward Cartwright as successor cotrustee to serve with him in place of said Bruce Cartwright, deceased, and submitted therewith an account of the transactions of the trustees from January 1, 1939, to March 11, 1939, and prayed for the approval of the account. The account was referred to a master who recommended its approval. Thereafter, on March 7, 1940, the executors of the will of Bruce Cartwright, deceased, having employed separate counsel to represent them, said counsel, in cooperation with counsel for the surviving trustee, filed a supplemental petition for the approval of the account. The trust being of a charitable nature, they prayed that the attorney general of the Territory be summoned to appear and answer and be bound by all proceedings to be had on said account.

Prior to the supplemental petition no request for summons to the attorney general had been made.

The attorney general, in his answer, did not question the correctness of any of the transactions shown in the current account. He did, however, challenge two expenditures appearing in former accounts which had been approved and allowed *ex parte*.

The items challenged were the payment of $125 to Akana's Nuuanu Funeral Parlors, Ltd., for burying Sam Nuuanu, appearing in the account for the period from July 21, 1937, to December 31, 1937, and the payment of $75 to Cameron & Johnstone for the preparation of federal and territorial tax returns for 1937, appearing in the accounts for the period from January 1, 1938, to December 31, 1938.

The executors of the will of the deceased trustee were represented by Antonio Perry, Esq., and the surviving trustee was represented by the firm of Anderson, Marx, Wrenn and Jenks.

The accounts were approved as filed, the attorney general's objections to the two items appearing in the former accounts were overruled, the attorney for the executors of the will of Bruce Cartwright was awarded a fee of $250 and the attorneys for the surviving trustee were awarded a fee of $200.

From the decree approving the accounts and awarding attorneys' fees the attorney general prosecutes this appeal and specifies as error the overruling of his objections to the two items mentioned and the awarding of attorneys' fees.

The authority to incur the expense of burying Sam Nuuanu did not exist unless the testatrix so provided in the trust instrument. In order to determine whether or not the testatrix so provided, every paragraph, sentence and word of the trust instrument must be considered.

The testatrix, by the first paragraph of her will, directed that her just debts, funeral and administration expenses be paid. She further directed the payment by her executor out of the residue of her estate of all inheritance, succession and transfer taxes on all devises and bequests and "all expenses required to carry out my wishes expressed in paragraph SECOND hereof." We must, therefore, examine paragraph second to ascertain what expenses are authorized by the quoted provision.

By paragraph second the testatrix expressed the wish to be buried alongside her deceased husband in the family burial plot in Oahu Cemetery, and requested her executor to provide for the perpetual care of said family plot and to have headstones erected and inscribed for each of the people buried in said plot. In addition to the headstones, she expressed the wish to have erected in said burial plot a large upright tombstone at the middle of the plot with the inscription "In Memory of Isaac Davis" at the top and below such inscription the names of all the persons buried in said plot. Following the provisions, of which the foregoing is a summary, the second paragraph continued: "I desire also to have provision made for the grave of SAM NUUANU in said burial plot, and to provide a headstone for him to have his name inscribed on the headstone and on said large tombstone, as aforesaid."

By the fourth paragraph she devised to Sam Nuuanu for life her country home and some adjacent land at Punaluu, Oahu, and the household goods and furniture situated therein.

By the seventh paragraph of her will the testatrix devised the residue of her estate to her trustees with a direction to them to pay to Sam Nuuanu out of the net income of her trust estate $20 per month, so long as he shall live.

The chancellor concluded that the foregoing provisions

of the will in favor of Sam Nuuanu, both during his lifetime and at the time of his death, are clear and unambiguous and required and authorized the trustees to give him a decent burial, including the challenged undertaker's charges, at the expense of her trust estate.

It is obvious that the testatrix did not *eo nomine* authorize the use of residue to pay an undertaker to bury Sam Nuuanu. It is argued, however, that such authority is impliedly granted by the provisions of the will to which we have referred.

It can hardly be questioned that the testatrix, by the provisions of the second paragraph of her will, made it clear that she wished and expected Sam Nuuanu to be buried in the grave for which she expressly provided. This being true, her direction to her executor in the first paragraph "to pay out of the residue of my estate * * * all expenses required to carry out my wishes expressed in paragraph SECOND hereof," appears to be express authority for charging her residuary estate with the reasonable expense of his burial. The amount expended is very modest and its reasonableness is not questioned.

The fact that the payment was made by her trustees instead of by her executor, who was directed to pay all expenses required to carry out her wishes, although not mentioned in the briefs, is worthy of comment. The death and burial of Sam Nuuanu did not occur until after her residuary estate had passed from her executor to her trustees. It passed to her trustees, however, burdened with such obligations as the testatrix had imposed upon it. The trustees were therefore the only ones legally authorized to disburse the fund from which payment was to be made.

The attorney general objects to the allowance of the fee of $75 paid to a tax expert for the preparation of the federal and territorial income tax returns of the trust

estate for the year 1937. It is first argued that the evidence shows that by reason of the simplicity of the returns and the fact that the nontaxable character of the estate had been established, the preparation of the returns was within the skill and ability of the ordinary trustee and that the trustees should have themselves prepared and filed them, and second, the fee was excessive even if the employment were justified.

On the other hand, the trustees undertake to justify the employment on the theory that the tax laws and tax returns present problems and complications which render the making of such returns beyond the skill and experience of an ordinary trustee and authorized them to avail themselves of the advice and services of a professional tax accountant or expert to protect the interests of the trust estate. The trustees also maintain that in view of the uncontroverted evidence that eight and one-half hours were required to prepare the returns and that the standard charge for such service is $10 per hour, the fee charged and paid was not excessive. Clearly the fee charged and paid was not excessive, so the sole question is, was the service of an expert reasonably necessary to protect the interests of the trust estate?

As to the necessity for employing an expert, this appears to us to present a border line case. The trust came into existence in about 1934. From that time the trustees each year employed the same firm to prepare and file the federal and territorial tax returns for the trust. The net income of the trust was to be devoted first to the payment of one small annuity and the remainder accumulated until a fund sufficient to erect such a hospital as the testatrix described was available. In the earlier returns the income remaining after the payment of the annuity was described as a donation to charity. On the facts both governments held the trust not taxable. Subsequently, a question was

524

raised as to the correctness of this designation of the income accumulated, and thereafter it was termed a bequest to charity to avoid the possibility of being confronted with a claim that one cannot escape taxes on more than five per cent of one's income by virtue of donations to charity. The foregoing, and the frequent change in the tax laws and the form of returns, are relied upon by the trustees to justify their conclusion that the services performed by the expert were beyond the skill and experience of an ordinary trustee.

The chancellor, in sustaining the expenditure, expressed the opinion that the whole subject of taxation is exceedingly involved, intricate and changeable, especially changeable; that what was required one year is not necessarily sufficient in subsequent years; and that only those who keep abreast of the times as to changes in the law and the regulations can safely be relied upon to properly prepare an income tax return. The opinion of the chancellor was based on the evidence, which was quite lengthy, and was in our opinion sufficient to support his findings, although there was also evidence to the contrary. Although the evidence would, in our opinion, support a contrary conclusion, we are not prepared to disagree with the conclusion of the chancellor that the employment of a tax expert was reasonably necessary for the protection of the trust estate.

There remains the objection of the attorney general to the fees allowed the attorneys.

His objections as stated in his brief are: "First, the necessity for the employment of two separate counsel was not shown. Second, regardless of the propriety of the employment of separate counsel, the amounts allowed as attorneys' fees were excessive."

It is the settled rule in this jurisdiction that the mere showing that legal services have been rendered to a fidu-

ciary is not sufficient to justify an allowance therefor. It must further appear that the services were necessary and for the benefit of the estate. (*In the matter of the Estate of Hiram Maikai*, 3 Haw. 522; *Estate of A. Enos*, 18 Haw. 542; *Estate of Lalakea*, 26 Haw. 243.)

It seems to be the settled rule in New York that where executors or other fiduciaries employ more than one attorney, no more can be allowed for such attorneys' services than would amount to reasonable compensation if only one were employed. (*In re Burroughs' Estate*, 278 N. Y. S. 997; *In re Kentana's Estate*, 10 N. Y. S. [2d] 811; *In re Bloomingdale's Estate*, 14 N. Y. S. [2d] 845.) The same rule was long ago announced in Pennsylvania in *McDaniel's Estate*, 9 Pa. Co. 232. The rule is stated by Corpus Juris thus: "Trustees are entitled to be allowed their reasonable costs and expenses for rendering and passing their accounts, so far as they are not at fault, including an allowance for counsel fees, * * * . Each of several trustees may not hire separate attorneys and require the estate to pay the fees." 65 C. J., Trusts § 866, pp. 946, 947.

*McGonagle* v. *Union Trust Co.*, 35 Haw. 473, 478, involved the allowance of fees to nine attorneys to be paid out of a fund to which there were approximately 875 claimants, a situation quite analogous to the situation confronting us. After determining the fee to be allowed as a single fee to be apportioned among the several attorneys according to the circumstances, we expressed our views on the general subject as follows: "At the risk of unduly extending this opinion, we call attention to the importance of fixing only one fee for services in such a case as this, regardless of the number of attorneys involved. The matter of allocating portions thereof to the various attorneys should be governed by the circumstances or may be left to the attorneys involved if the circum-

526

stances warrant that procedure. Any attempt to allow each attorney an adequate fee based on the number of court hearings and the time spent in preparation, where a large number of attorneys are to be paid out of a fund recovered or preserved, is bound to result in casting too great a burden upon parties who did not employ them. Counsel should realize the likely consequences of such a situation at the outset of such litigation as this and take steps to have class representation formally established." (See also *Folts* v. *Globe Life Ins. Co.*, 119 Neb. 143, 227 N. W. 455, and *Shively* v. *Daviess County Bank & Trust Co.*, 144 Ky. 299, 137 S. W. 1086.)

All of the foregoing authorities are cited in appellant's opening brief and have been ignored by the appellees.

The sole evidence as to when and why it was decided that separate counsel should be employed to represent the executors of the deceased trustee was given by attorneys Perry and Kidwell, who were in agreement. We quote the evidence of attorney Perry on this question: "This petition was filed on March 7 of this year. About a week or 10 days prior to that I was consulted by the executors of the will of Bruce Cartwright, who had died on Mar 11 1939, and who in his lifetime was one of the two trustees in the estate of Lucy Henriques. My duty as they gave it to me was to protect the estate of Bruce Cartwright, which was still in the course of administration, from any liability for his acts or omissions during his term of service.

"Prior to my being consulted, the firm of Anderson, Marx, Wrenn and Jenks had been attorneys for sometime past for both trustees in this estate, but upon Bruce Cartwright's death and Mr. Hite being appointed successor trustee to Mr. Cartwright in the Queen Emma estate, questions of conflicts and possible conflicts of duty arose in the minds of the firm I have just named, with the result

that they came to the conclusion that they could no longer serve Bruce Cartwright's executors, in case of several somewhat related matters which were then in their office, and they therefore resigned in so far as their representation of Bruce Cartwright was concerned, and that was what led to my appointment.

"That same conflict continued to exist, has continued ever since. They continued however, to be attorneys for Norman Applegarth, who at the time I was called in and since, was, and has been one of the trustees of this estate.

"So much as to why there are two attorneys in the case now. My representation throughout purely has been on behalf of the executors, and Mr. Kidwell's [of the firm above-named] on behalf of Mr. Applegarth."

The authorities which we have cited convince us that only one fee payable out of trust funds should have been allowed. The circumstance which led to the employment of separate counsel by the executors does not convince us that this case justifies a departure from the rule announced by those authorities. Trustees ordinarily act jointly and the record in this case presents no instance in which the trustees acted otherwise. It therefore follows that there was no necessity for employing one attorney to represent the executors of the deceased trustee and another to represent the surviving trustee. The fee allowed counsel for the executors we find to be a reasonable fee to be a charge upon the trust estate. Under the circumstances no apportionment of that fee will be ordered but apportionment thereof will be left to the attorneys.

That portion of the decree awarding a fee to counsel for the surviving trustee is reversed. In all other respects the decree is affirmed.

*E. K. Kai*, Assistant Attorney General, for J. V. Hodgson, Attorney General, appellant.

*A. Perry* for William Edward Cartwright and Hawai-

ian Trust Company, Limited, executors of the will of Bruce Cartwright, deceased trustee, appellees.

*Anderson, Wrenn & Jenks* for Norman W. Applegarth, trustee, appellee.